0209, Dominick Choate v. Indiana Harbor Belt Railroad. Counsel? Thank you, Your Honor. Oh, and one other thing. This is not a microphone. This is a recording device. You need to keep your voices up so you can compete with the air conditioning on LaSalle. Please identify yourself for the record. My name is Evan Tager. I represent the defendants' appellants in this matter. It is undisputed that while trespassing on defendants' right-of-way and despite having been warned over a dozen times that trains are dangerous, Dominick Choate attempted to jump on a moving train three times in order to impress his girlfriend. When he got injured, he sued the railroads, claiming that they had a duty under con to protect him from his own impetuousness. The trial court allowed him to take his case to the jury, which found in his favor. The jury's finding that the railroads had a duty is contrary to both Illinois law and the facts of this case. The court should reverse and render judgment in favor of defendants for three independent reasons. First, con and the many cases following it hold that there is no duty as a matter of law when the danger of the condition that injured the plaintiff is obvious to children of the plaintiff's age. Here, it is objectively obvious to children of nearly 13 years of age that jumping on a moving train or jumping on a train that's moving 10 miles an hour is dangerous. What's the best case you've got that stands for the proposition that flipping a freight train is an open and obvious danger? I didn't hear the rest of the question. What is the best case that you have that stands for the proposition that flipping a freight train is an open and obvious danger? Well, there's Lebeau and Fitzgerald, which we acknowledge are not binding, but they are over 100 years old and they are quite evidential of the way courts have viewed this issue for 100 years. I'd also refer the court to comment I of section 339 of the statement, which con was basically designed to come into agreement with. The notes to that comment specifically state that a moving train is one of the conditions, quote, whose danger the child can reasonably be expected to appreciate. And, of course, as we and the amici point out, there are myriad cases throughout the country applying the same basic doctrine and finding that jumping on a moving freight train is objectively obviously dangerous to children of this age. Now, the trial court rested its contrary decision on Engle. So let's confront that head on. I'm sorry, counsel, on what? On the Engle case, E-N-G-L-E. Now, Engle left open the possibility of holding that there is no duty as a matter of law under different circumstances from the ones involved there. And we've pointed out in our briefs that there are different circumstances here. Most importantly, that the train in Engle was moving much more slowly than the one involved here, making the danger of trying to jump on it much less obvious. I think it's also important to note that the court viewed that case. Let me ask you, so is it your thesis that the danger of flipping a freight train isn't always open and obvious? It depends on the speed of the train? I think, well, I think it's always open and obvious, but we have Engle. It's out there. We've got to confront it. Personally, I think it was wrongly decided, and I'm going to get into that in a minute. But I don't think you need to go that far and expressly disagree with it because of the two distinctions I'm going to bring to you. I mean, if it's the speed of the train that makes it open and obvious, it becomes a jury question, doesn't it? No, I don't think so. Why not? Two miles an hour, fast enough? No, this duty is clearly an issue of law, and the courts have specifically said whether Duty is an issue of law, provided that the duty doesn't rest on a factual determination. Well, that's not a fact. If there was a dispute as to how fast it was going, that would be for the jury. So the court can say two miles an hour is a matter of law, is not fast enough to make it open and obvious, but five miles an hour is? Yes, that's the job of the court, not the jury. You think that's a question of law? That's absolutely a question of law. That's what all the cases say, that whether or not a particular condition is open and obviously dangerous is for the court, not the jury. If there are actual facts in dispute, like I said, how fast was it going? Here, there's no dispute. Everybody agreed it was nine or ten miles an hour. So, yes, you have to be the ones to decide that. And in Engle, it was going four to five miles an hour. And let me just, you know, I was thinking about this this morning. If you ever use a treadmill, you know that four or five miles an hour, you're walking. Five is a brisk walk, to be sure. But four miles, you're walking. Nine to ten, you're running hard. So there's a huge difference there, especially if you're 12. He's 12 and three quarters years old, and he's four foot ten inches tall at the time. So he's running very hard. So, anyway, that's one basis. But the evidence says that he was able to outrun the train and that he didn't have any trouble with keeping up with it. Well, he said he was running along with it. He did. But it's undisputed. The speed is undisputed. So, I mean, we all know, based on common experience, what it takes to go nine to ten miles an hour. And he was doing this on stones, with tennis sneakers, on an incline. So, I mean, that part, all of that is undisputed. He conceded that. If I can move on to the other point, which I think is very important about Engler. The court viewed that case through the lens of it being a suit against the Park District. The railroad was out of the case. The plaintiffs dismissed them, got them out of there, so they could focus their attention on the Park District, which had engaged in some bad falsification of evidence, if you recall from the opinion. But the duty there was, accordingly, quite narrow. It was simply to repair a hole in a fence around the park. It's a completely different kind of situation from what they're saying the duty would be here. So those are the two bases on which I think Engler is clearly distinguishable. But perhaps even more importantly, Engler predates the Supreme Court's decision in the Mount Zion case, which we've cited extensively in our briefs. That case provides the most detailed and expansive articulation of the circumstances under which there's no duty, because the danger is objectively obvious. And if I may, I'd like to quote from that case, because it's so clear that Engler can no longer be reconciled with what the court is saying. After making clear that this was an issue of law for the court, not for the jury to decide, the Supreme Court explained, quote, the responsibility for a child's safety lies primarily with his or her parents, whose duty it is to see that the child is not placed in danger. The court continued that a possessor of land is free to rely upon the assumption that any child old enough to be allowed at large by his parents will appreciate certain obvious dangers. It concluded that where a child is permitted to be at large, beyond the watchful eye of his parent, it is reasonable to expect, and it italicized that, that that child can appreciate certain particular dangers. Applying that principle, the court found no duty. What did they identify as those principles? Pardon me? What did the court identify as those conditions? Fire, the danger of falling from height, and what else?  Water. Did they identify moving freight trains at 10 miles an hour? No, the court has never addressed that specifically. It's expressly left it open. However, think about it. They said in this case that a six-year-old should have been able to appreciate the danger of a calm blue pool. If a six-year-old should be able to appreciate the danger of that, how can it not be the case that a nearly 13-year-old should not be held to appreciate the danger of a massive moving freight train? Loud, too. I mean, he testified himself that it was extremely loud. So I think that the juxtaposition of those two make it impossible to conclude that insofar as Engle would be broadly interpreted, it's any longer good law. Now, if I may, I'd like to move on to our second round for giving us judgment. Under Kahn, there is no duty when the particular child trespasser is aware of the danger in question, even if the danger might not otherwise be deemed to be obvious to children of his age generally. Now, let me just stop for a second and explain how this works conceptually. The court decides whether or not it's objectively obviously dangerous. So either the trial court or, in this case, the appellate court makes that decision. If the decision is that it's not, that's no longer an issue. The issue of whether it's objectively obviously dangerous is no longer an issue in the case. The only thing left at this point is whether the plaintiff actually understood the danger. The courts have said in case after case after case that even if it's not objectively obvious to children of a particular age, if the particular plaintiff knows, then there can be no duty either. Here, the evidence that Choate was aware of the danger of jumping on moving trains was so overwhelming that the court can and should reverse and render judgment for the defendants on this ground. Let me start with his admission during his deposition. This is what he said. Question. So you recognize train tracks as being dangerous, correct? Answer, yes. Question. And you recognize that on the day of the accident, the train tracks were dangerous, correct? It's in the present tense or the past tense. Exactly. It's in the present tense. I understand it's in the present tense, Your Honor. Nobody in this case has ever understood it to mean that he didn't understand that at the time. Indeed, if I may, let me quote from the plaintiff's plea. I don't understand it to mean that. Pardon me? I don't understand it to necessarily mean that. But that's you on the cold transcript. All of the lawyers in this case, all of the parties, this is what the plaintiffs say in their brief. Defense counsel impeached Dominic with his deposition testimony where he said that he recognized on the day of the accident that train tracks were dangerous and that the train he was grabbing onto was dangerous. That's page 43 of their brief. I agree. I'm not even sure it was properly transcribed tense-wise. Wait a minute. Hold on a second. What do you mean you're not sure? Were you there? No. How do you know it was properly transcribed? I don't know. I said I'm not sure. My point is I know that everybody in the case who's been there since the beginning has understood it to mean, even the judge understood it, the trial judge understood it to mean. But that's not the issue. I'm determining whether or not it's admission. It has to be a clear and emphatic admission. Well, I think it was certainly intended to be, it was understood to be by everybody involved in the case. But if you're not persuaded by that. Isn't that not for what the plaintiff was saying? Isn't that what everybody in general understood? The plaintiff's counsel, I think, because they knew what he meant, never asked him at trial. Did you mean present tense or past tense? They didn't ask him at all. We had to do it during cross. Because you were using it as impeachment, correct? Right. And because they didn't want to go anywhere near the issue. But let's, you know, I believe that given the context, which is that the judge, you know, the motions in limine preceded on that basis. The judge ruled on the basis not that it was temporally problematic, but simply that it was a conclusion, not a fact. And I think that's pretty, you know, pretty clearly wrong. What he knew is a fact. Just like Sienta in a fraud case is a fact. So if you take that off the table, the point you guys have articulated simply was never raised below by them. The judge, you know, it was simply not the basis for the way this issue came up. But if you don't agree with us that that was a binding judicial admission, it is still evidence on our side of the scale. And let me. Well, but it would be evidence on your side of the scale to be judged by the judge. Well, under the Pedra case, which is the seminal Supreme Court case in this state, you're supposed to look at all of the evidence on the issue and then decide whether the little bit they have, and it is quite little. He just said, let me go to his. Well, let me complete. The rule is you look at everything in totality. And if I may, let me quote the case because I think it's a very nice analogy. We know the Pedra case. We deal with everything. Okay. So the candlelight analogy is exactly this case. All they've got on their side is his statement, questions. And so you knew while you were attempting to jump on that train that you were doing something dangerous, but you couldn't resist the chance to impress Elisa with your courage or your athletic skill. Answer, not while I was doing it, I didn't know it was dangerous, but knowing of the dangers, yes. Now, I'm not really sure what he meant by the last part of that. My speculation is what he meant was he knew it before and he knew it after, but he wasn't thinking about it when he was trying to jump on the train. But be that as it may, that is the only evidence in this case. Against it is what he said in his deposition, his admission at trial that his mother had warned him over a dozen times, his mother's admission that she had repeatedly warned him in vivid fashion. Did he admit that his mother warned him of the danger or did he merely admit that his mother told him not to do it? I think he... Not to go near the tracks. His mother is the one, I believe, in the deposition that testified about how she talked about the dangers. I don't recall him testifying that he was warned about the danger, just told not to do it. No, I think he admitted she told him it was dangerous. Where there was a bit of a disconnect was she testified that she told him about the childhood friend who lost his legs, and he said he doesn't remember her telling him. Right, because he doesn't remember, doesn't know, didn't understand that you could die or lose a limb as a result of jumping. Well, he never said that. In fact, he understood, he defined danger as meaning you could lose your life or limb. He never said I never understood I could lose my legs if I did this. I thought maybe I could get hurt some other way. You know, he never said that. Like I said, he had no affirmative testimony on this point at all. It was simply that one answer on cross-examination. So again, you also have the testimony of his five companions. Now, that breaks down into two pieces. Piece one is the part the judge excluded, in which every single one of them said, I know that it was dangerous. I knew it at the time. Now, the judge excluded it, and I think that's wrong for two reasons. One is it's circumstantial evidence of what, well, actually, it boils down to one reason. Circumstantial evidence of what the sixth member of their group knew, if everybody else in the group knew the same thing. And I don't think that there was any... We're dealing with subjective knowledge. Are we dealing with the members of the group, or what he knew? You can, a jury can fairly infer from the fact that everybody else who was in that parking lot knew it was dangerous. People that hang out together all the time, they all knew it was dangerous. You can infer from that, it's a fair inference, like snow in the night in the jury instructions, that he knew too. That's circumstantial evidence. So if you conclude that the judge was wrong in excluding it, that goes on our side. But even if you don't, several of them testified that they told him not to go there after he said he was going to try it. So he disputes he said that, but they testified, we told him not to do it. So that's there too. So... Did not Blaynev testify that he agreed that the definition of dangerous was that that was something that could kill you or take a body part, correct? Yes. And then, but then he went on further to say that he didn't know that he was doing something dangerous. Is that not correct? That's the testimony of Blaynev. From, I don't recall him saying that. I mean, I guess... And he only knew that it was dangerous after he had been injured. He said that statement on cross, that's what he said. And, you know, it's there, it's in the record. My point is that if Pedrick means anything, it means that when you're contradicting a prior statement, when you're saying that you didn't know something was dangerous after admitting that you had been warned about the very thing over a dozen times, when all of your friends testify that they knew it was dangerous and that they told you not to do it, that Pedrick maps onto that perfectly and says, you don't have to uphold that judgment and you shouldn't uphold that judgment. Now, let me move from there to the special interrogatory. Because there was such a massive imbalance in the evidence on this point, it's absolutely inexcusable that the judge refused to give our special interrogatory. That would have forced the jury to confront this issue head on. Now, I know the court's familiar with the statute and the reasons why the statute exists. It's a mandatory rule and it says the court must give the jury a request in interrogatory so long as, quote, it relates to an ultimate question of fact upon which the rights of the parties depend and an answer responsive to the interrogatory might be inconsistent with a general jury verdict. The request in interrogatory would have asked, at the time and place of Dominic Cho's accident, did he appreciate that attempting to jump onto a moving freight train presented a risk of harm to him? Clearly, if the jury had been given this interrogatory and answered that he did appreciate it, it would have been utterly inconsistent with the general verdict of liability. Does he have to appreciate a risk of harm or an unreasonable risk of harm? I think he has to. Well, I think he has to. How about an answer? I think he has to appreciate that there was a risk of harm to him. He doesn't have to appreciate that there's a reasonable risk of harm? You mean a substantial risk of harm? An unreasonable risk of harm. No, I don't. What does the conduct say? Pardon me? What does the conduct say? Unreasonable risk of harm. Okay, well, first of all, con is not a statute. It doesn't mean that every word has to be perfectly tracked. Second of all, this is not the basis on which the judge rejected the interrogatory, nor did they ever raise that. Counsel, we can affirm the judge for any reason that appears in the record. No, no, no. Regardless of whether he relied on it or not. Not under the Hills of Palos condominium case, which I urge you to read, 255 Illap III at 448. That case has exactly the situation where the judge refused to give a special interrogatory on one basis. The plaintiff in the case abandoned the reason that the judge had given and then on appeal said the problem is it wasn't worded properly. And the court of appeal, or the appellate court, excuse me, rejected that argument saying this objection has to form, however, was not raised in the trial court. So as to give the defendant an opportunity to address and cure it. That's exactly the situation here. If you're saying the word reasonable needed to be, or unreasonable needed to be there, or if they say in appeal the adverb fully needed to be in there, those are the kinds of things where if that had been raised in the trial court, we could have said fine, put it in there. But we were never given that choice. Counsel, your special interrogatory asked to force the jury to answer an ultimate issue in the case. The ultimate issue in the case was did he appreciate an unreasonable risk of harm? Even if they answered affirmatively and said he appreciated the risk of harm, that would not have answered the ultimate issue. So you've got, it's not merely form, it's not the ultimate issue. Well, that's really what form boils down to is whether you've correctly stated the legal principle. And we think that we stated it accurately. I'm pretty confident that we can find case law among the dozens of post-con cases that doesn't use the word unreasonable. Well, I'm sure if you go to the New York Sup you can. No, I bet I could find it even in Illinois. But the point is that the Hills of Palos case says you can't, this is such a critical protection for defendants or parties really more broadly, that you can't reject a special interrogatory on one ground and then come back and say you were missing one word, you're out of luck, when we easily could have acquiesced to that one word at trial. And it was especially important here because of the massive imbalance of the evidence on this issue. We had a right to make the jury confront it. Start wrapping up, counsel. Okay, well I had wanted to talk a little bit about the last prong which has to do with the cost being slight. And I'm just going to cut to the bottom line here which is there is not any case since Kahn was decided  to do anything close to as extensive as the plaintiff's experts said needed to be done here. Specifically, he said they had to do two things. They had to completely fence the 6,000 foot corridor between Ridgeland and Central on both sides continuously replacing the fencing whenever people cut holes in it as they were known to do. And they also had to build a pedestrian overpass at Austin and monitor it to determine whether it sufficiently reduced trespassing and if not, build a second overpass near where the accident happened. No case has ever gone beyond requiring a warning or repairing a fence in a very limited area such as When you compare the cost of doing those remediations to the risk to the child, does that not pass the muster of Kahn? No, I don't think so, Your Honor. There are many cases that say railroads don't have to fence their entire right-of-way because that would be overly burdensome even though somebody died in those cases. We're talking about 6,000. We're talking about... Not the entire right-of-way. Well, it's 6,000 on both sides so you're talking about close to 12,000 feet. You're talking about an overpass which would have to be ADA compliant, which would have to have ramps that would proceed from property not owned by the railroads, which would have to be approved by the Illinois Commerce Commission. All of that would be exceptionally expensive and still the plaintiff's expert can't say it would have prevented the accident. If I can have your indulgence, I'd like to just read you one statement he made which proves how totally speculative his testimony was. Your time really is expired. Read it and... Read it and sit down. He said, this is in response to our questions about the second overpass, which he said might be necessary, and he said, once you make the initial improvements that in my opinion are justified and needed, then you need to monitor. And right now all of your questions are speculative because we don't know. If you were to install fencing and put in an overpass, I would expect that that would solve virtually all of the problems. Now it may not. How much of the problem remains, no one would know until you do this. So I can't speculate, nor can you, nor can anyone else as to what you might find. That is simply not sufficiently definite expert testimony to support a verdict on this problem of kind. Thank you, counsel. You'll have a very short rebuttal. Good morning, Your Honors. My name is Michael Lundblad, and I represent Plaintiff Dominic Choate in this case. I think the record in this case is unique in that there was a tremendous amount of evidence coming from the defendant's side through adverse witnesses that 12-year-old children objectively do not understand the risks and dangers of railroads and trains. In particular, the testimony of Lieutenant Griffith, who was in charge of the Railroad's Lifesaver Program. He testified that he went to schools, junior highs, elementary schools, senior high schools, and he found that children of those ages did not appreciate all the risks of trains and, in particular, the risk of trying to flip a ride or pop a ride on a train. In addition, there were videotapes that were played to the jury, and in those tapes, in particular one called David's Run, it again showed that children, these people were driving motorbikes, 16 years old, did not appreciate the hazard of being on a train, the hazard of being on a train when it moved. So I think the trial court was accurate and should be affirmed in his decision in finding that the railroad owed a duty. In addition to the educational things that came out, it also came out in the record that the railroad had knowledge, intensive knowledge of what was going on in their tracks. They had ten boxes of citations that were written up by their security officers showing that children were on their tracks, some as young as four years old. Others were dragging bicycles under trains. So I think that this case properly went forward on the issue of duty. Now, with regard to Dominic's knowledge, in his deposition, he testified that if he had it over, he wished he could relive that day. After the fact, obviously, he knew that it was dangerous to have done what he did. The only thing that he testified to in his deposition was that he had general knowledge about the danger of trains. The evidence is that the plaintiff saw another of his companions attempt this, to jump on the freight train and fail, and that he tried twice himself and failed before that third attempt. Isn't that evidence that there was danger? There should have been a prize.  He was almost 13 years old. In fact, the record suggests that it was not even his idea to try to jump a ride in the train. But I believe that based on the Supreme Court decisions in both Cope and Corcoran, and I think even Mount Zion, the standard that is to be applied in determining duty is that of an objective standard. And I believe and submit that when it comes to the personal knowledge of a plaintiff, that that issue then goes to the comparative fault of that plaintiff. And in this particular case, the defendants had wide latitude in arguing that this accident was totally caused or certainly more than 51 percent caused by the conduct of Dominick. And, in fact, in closing argument, defense counsel went through 12 steps where he argued that Dominick had the opportunity to stop and walk away and the accident would have been averted. The jury heard that evidence, and they concluded that, yes, Dominick was comparatively at fault, and they, in fact, found that he was 40 percent the approximate cause of the incident. So I believe that the issue regarding Dominick's knowledge and conduct was fully litigated, and the jury had every opportunity to find that he was the cause of the accident and deny him recovery. They did find that he was partially at fault, but not enough to prevent him from recovering. With regard to the issue of speed, I would only point out that the speeds of the train were merely estimates by the people who were there, and in particular by children who have very limited experience in making such calculations, that the best determination was the testimony of Dominick, who said that he, at 4 feet 11, was capable of running faster than the train. So I believe that when he saw the train and the train was moving slowly, that he thought he was capable of jumping on the ladder and catching a ride. With regard to the special interrogatory, again, that even if it had been submitted, it would not have been determinative of the case. I would submit that in addition to the comments of Justice Hoffman, which I agree with, again, I believe the special interrogatory is negated by the fact that there was the defense of comparative fault, and if they had responded that Dominick had some appreciation of the danger, that it went to that issue, and an answer in the affirmative would still not preclude his recovery. It would only be a damage reducer. With regard to the final aspect of it, the expert in this case, Dr. Berg, was not advocating that the defendants in this case have to put fences all through their hundreds of miles of track, or in this case I believe they have 55 miles of track, the Indiana Harbor Belt. What he was saying is that this particular situation posed a unique problem, that you had a village cut in half by the railroad tracks, that the evidence was that you had schools on both sides, you had apartment buildings on both sides, you had houses on both sides, and you had a park right next door where Little Leaguers played all summer, and that as a result of this particular situation where there was no legal crossing for 6,000 feet, that it was unavoidable that people, kids, were going to cross, and that there was going to be hazard and danger whenever there's a conflict between pedestrians and trains. And what he proposed was a very reasonable and very focused solution, and one that would have prevented the accident. One has to keep in mind that the whole... I had a couple of questions for you on the special environment. If they had ordered it and requested it, requested a special interrogatory inquiry of the jury whether they found that the plaintiff recognized and appreciated the full risk of harm to him, would they have been entitled to that? I would respectfully say that it would still not go to the ultimate issue because it's my position or plaintiff's position that, again, what he appreciates goes to the comparative fault issue. But if he appreciates the full risk of harm, he then must subjectively recognize the danger to him, in which case there'd be no duty. Well, I believe that under Corcoran and the Cope cases is that they look at, in determining whether or not there is duty, that you have to look at an objective standard as to what children of the same age would understand. For example, it would seem to me that if it were a subjective test, that in this particular case, based on facts, we could have a very anomalous situation. For example, the testimony of Mr. Austin Patton, the independent witness, was that Charlie Spindler went up to the track first. He tried to get on the train and was knocked down. We could have had two people injured. And if one child in his deposition said, I didn't know anything about danger, but another child said, I had some appreciation of it, I believe it would be an anomalous and incongruous result to say, well, railroad owed a duty to Plaintiff A but not to Plaintiff B. I think that in determining duty, one has to look at an objective standard. What do the average 12-year-old children understand about the hazards and risks of trains? Are you saying that there's no subjective part of a duty rule or a duty analysis in this case? I believe that under, if you look at the language of the Supreme Court in Kipcorin and Cope, and even in Mount Zion, they are talking about what would be reasonable. They talk about an objective standard, and they say that in determining duty, you have to look at what does the average 12-year-old or the average person within the same group, what is their knowledge? And they do not bring into the equation the personal knowledge. I believe that that element, the personal knowledge, is taken care of in the comparative fault issue, because if the jury finds that the plaintiff had some recognition of the hazard but went forward anyway and was more than 51 percent at fault, then that person is barred from recovery. But as far as determining policy-wise what should a defendant do to correct or prevent injury, I think that you have to look at the objective standard. What's the standard of review on the denial of a special interrogatory? I believe that the standard of review is that of de novo. What's the standard of review on the question of whether an admission is a judicial admission or not?  And I believe that the judge in this case in analyzing the language and what was said made a proper decision that it was not a judicial admission. And, in fact, he did give the defendants the opportunity or invited them if they wanted to pursue it more, they could have, by putting Dominick on a stand in their case, which they chose not to. So I believe, in the end, court properly ruled that there was a duty, allowed the case to go to trial, that the trial judge gave the defendants a fair opportunity to defend themselves, and a jury verdict in this case should be allowed to stand. Thank you. Your Honor. Thank you, Your Honor. I'll try to be very brief. Do you have a notion on the standards of review? On the first one, he's right, it's de novo. On the second one, I think he's wrong. I think it's also de novo because the judge ruled on a legal question. The judge said knowledge of the danger is an opinion, not a fact. So it seems to me that is reviewable de novo. The point that Your Honor had made about whether it had the right wording wasn't the basis of the judge's ruling. So I don't see how you can... But if it's a de novo review, does it make any difference what the basis of his ruling was? Well, my point was you can't defer to him. You can't use a discretion standard, but... We didn't pay any attention to what he said. It's de novo. Well, as I said, I still think you need to look at what we had a chance to see in the trial court and react to. In the de novo review on the denial of a special interrogatory, what's the question for the court? Was the special interrogatory proper in form? Well, I guess I would say it is whether the legal basis on which the trial court ruled is erroneous. No, there would be a clearly erroneous standard. No, it's legally erroneous. Clearly erroneous applies to factual determination. But de novo means it's our decision based on our understanding of the law, not his. Right, understanding of the law. Right. And what is the basis for the denial of a special interrogatory? There's only one, that the special interrogatory was not proper in form. So we have to decide as a matter of law whether your special interrogatory was or was not proper in form. Was it? Well, like I said, I think the Hills of Palos Condo case takes us out of the sort of typical situation. Let's say this was a fight over whether something was hearsay, and you think, well, there was a different exemption to the hearsay rule than the one the judge ruled on, therefore it was okay to let it in even though the judge was wrong about the exception the judge used. That's different from this in which you've got a statute that says you've got to give the instruction, you've got a case that says the defendant has to be given a chance to tweak the language if there's a problem with a missing adjective or adverb, and won't allow a judgment to stand when the defendant hasn't been given that opportunity and the trial court's reason is wrong, which is exactly the case in both there and here. Now, I did quickly try to look up the question of unreasonable. I don't think it's... Corcoran. Go read Corcoran. I think that... Go read Corcoran. Pardon me? Go read Corcoran. Corcoran. But Corcoran's not the only case and a lot of the others don't use the word. So... Well, it is a Supreme Court case, so we don't always follow them, but we try to. Well, but there's four or five con cases in the Supreme Court. I think, as I said before, courts use different phrases to describe rules all the time. It doesn't turn them into statutes and say you've got to use every word in a special interrogatory. But, you know, as I said before... You know, I mean, if your thesis was correct, as long as the child recognized some danger, then you're suggesting that subjectively there be no duty odor. There's a big difference between a child realizing the danger of a sprained ankle and an amputation of a leg. Does he appreciate the full risk of harm? Does he appreciate how unreasonable the risk of harm is? We all encounter risks of harm on a daily basis. We make a value judgment. Are they unreasonable or are they not unreasonable? Did this child understand that it was unreasonable? Did this child understand the full risk? Well, it's not an Illinois case, but we did cite a case from California that says it's not necessary under 339 for the child to understand the exact risk that injured them, so long as they understand that what they're doing is dangerous. And I think that if Illinois had the chance to consider that issue, they'd come out the same way, because Kahn is meant to be a narrow exception to the rule that landowners aren't responsible for injuries to people who trespass on their property. And it seems to me when you've got somebody who knows that something's dangerous but simply can't articulate precisely what the danger is, that that's enough under Kahn. You wanted the special interrogatory as a check on the jury's determination as to the subjective harm of the duty, correct? And if we were to find, because there was some waiver or forfeiture, that interrogatory would not have been a check as it's phrased on the subjective part of the duty. Isn't that correct, based on what Justice Hoffman said? If what you're saying is answering an interrogatory that doesn't accurately articulate the law doesn't serve the purposes of the statute, I think we can agree with that. It needs to accurately state the law. And this one did not. Well, we think it did. Based on California. No. I don't think there's no case that says this is the unwavering standard. This is what you must use. If there were, surely we would have used those words. We did the best we could based on, there's like 20, 30 cases. We pulled from them what we could. The objection to the interrogatory had nothing to do with it. In fact, today Mr. Lindblad comes, he can't be pinned down. In his response of grief, he abandons the comparative negligence point. Now he comes back to it, and that's his principal argument again. The case law, as we point out in our opening brief, is so clear that comparative negligence doesn't have anything to do with the existence of the duty in that the jury first has to decide whether the plaintiff had the subjective awareness. You don't even get to comparative fault. There's case after case that says that. So he was wrong there. That was the basis on which he got the judge to reject the instruction, the interrogatory. And it seems to me that under the Hills case, that's all we need to get the new trial on this point. Now if I can just touch on a couple of other points he made. Your time has expired. It's expired. You really need to conclude in all fairness. I understand. I'm just trying to respond to it. You had 28 minutes in your opening. The opposing counsel only took 10, and now you've had another 8 minutes. So you really need to conclude. Okay. Two very fast things. One, Patton, who was a disinterested bystander who was an adult, said it was going at least 10 miles an hour. Second, on the subject of the experts saying they don't have to build fencing everywhere, he based his entire testimony on these contact cards, which are basically violations handed out by the police officers, that were throughout the whole thing, including at at-grade crossings at Ridgeland. They had many, many violations at the Ridgeland at-grade crossing. So to say, well, we're not going to, you know, that was hipster dixit. He said you don't have to build fence everywhere, but he relied on violations everywhere. Thank you, Your Honor. Thank you, counsel. This matter will be taken under advisement. This court is adjourned.